# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LARKINS/LEE/PHILLIPS, Minors.

UNPUBLISHED
September 25, 2018

No. 341382
Wayne Circuit Court
Family Division
LC No. 15-519844-NA

Before: M. J. KELLY, P.J., and MARKEY and FORT HOOD, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights[1] pursuant to MCL 712A.19b(3)(g) and (j).[2] For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

Respondent's children were removed from her care in 2015 because of allegations that respondent's live-in partner, Otis Lee, who is the biological father of respondent's three youngest children, was abusing her older children. Her four oldest children, including LL and JP, were eventually placed with their biological father, Roderick Larkins, and, after completing a case services plan, respondent regained custody of her three youngest daughters, AL, BL, and JL. Subsequently, petitioner, the Department of Health and Human Services (DHHS), filed a petition seeking termination of respondent's parental rights after LL disclosed that Larkins had sexually abused her and that respondent knew of the abuse and failed to report it or intervene.

The protective proceedings were complex and lengthy because multiple petitions were dismissed and refiled for various reasons. As a result, LL testified three times about the three

---

[1] This appeal only involves the termination of respondent's parental rights to five of her seven children: LL, JP, AL, BL, and JL. Respondent's other two children, BAL and RL, were in the care of a legal guardian at the time of the termination proceeding and were not subjects of the permanent custody proceeding.

[2] The trial court also terminated the parental rights of LL and JP's father, Roderick Larkins, but that decision has not been challenged on appeal. The parental rights of Otis Lee, the father of AL, BL, and JL, were previously terminated.

incidents of sexual abuse perpetrated by Larkins and about whether and when she informed respondent that the abuse took place. Her testimony concerning when she told respondent about the abuse changed over time. Although LL had previously testified that she informed respondent of each incident shortly after it occurred, at the third and final termination hearing, LL testified that she told respondent about the abuse the same night that the third incident occurred. She said that respondent told her to call the police and to sleep in the same room as her brothers. She testified that soon after that incident, she went to live with her godmother. RL,[3] LL's brother, also testified about being sexually abused by Larkins, and he said that he told respondent about it the same day it occurred. A day or two later, RL went to live with his pastor. There was no testimony that respondent ever called the police or Children's Protective Services (CPS).

Although the trial court acknowledged that LL's testimony was inconsistent regarding when exactly she disclosed the sexual abuse to respondent, it found that at a minimum, respondent knew of the abuse while LL was still residing in Larkins's home. It also found that respondent knew that Larkins sexually abused RL while he was still residing in Larkins's home. Accordingly, the trial court found that there was clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(g) and (j). It also found that termination was in the children's best interests.

## II. REASONABLE EFFORTS

### A. STANDARD OF REVIEW

Respondent first contends that the trial court erred by terminating her parental rights because DHHS did not make reasonable accommodations or reasonable efforts to provide reunification services even though it was aware that respondent had a cognitive disability. However, respondent failed to object to or indicate that services were inadequate in the trial court and when a respondent fails to object or indicate that reunification services provided are inadequate, the issue is unpreserved for appellate review. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). We review unpreserved issues for "plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008).

### B. ANALYSIS

DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). In making reasonable efforts to reunify a family, public bodies like DHHS "must make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . .' " *Id*. at 86, quoting 28 CFR 35.130(b)(7)(2016). But there are two situations in which DHHS is not required to make reasonable efforts to reunify a child with a parent: first, when aggravating circumstances exist, MCL 712A.19a(2), and second, "when termination of

---

[3] RL was in a legal guardianship and was not a party to the child protective proceedings.

parental rights is the agency's goal," *In re Moss*, 301 Mich App 76, 91; 836 NW2d 182 (2013) (quotation marks and citation omitted).

Both of these exceptions apply in respondent's case. The first exception, aggravated circumstances, includes when a child is sexually abused and the parent is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate the risk. See MCL 712A.19a(2); MCL 722.638(1)(a)(*ii*). In such instances, "the department shall include a request for termination of parental rights at the initial dispositional hearing . . . ." MCL 722.638(2). This case implicates the second exception, which applies when DHHS's goal in the original petition is termination of the respondent's parental rights. *In re Moss*, 301 Mich App at 91. In this case, the trial court found that respondent knew of the sexual abuse of both LL and RL, but she did nothing to intervene. Therefore, termination of her parental rights was requested in the original petition, and DHHS was not mandated to provide reunification services. *Id*. at 90-92; MCL 712A.19a(2). Had DHHS been obligated to provide reunification services, it would have been required to make reasonable accommodations for respondent's intellectual disability if it knew or had reason to know that one existed. But because respondent was not entitled to reunification services, she was not entitled to reasonable accommodations of the services DHHS was under no obligation to provide.

## III. STATUTORY GROUNDS

## A. STANDARD OF REVIEW

Respondent next argues that there was insufficient evidence to terminate her parental rights because LL's testimony was inconsistent throughout the proceedings. We review "for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *In re Moss*, 301 Mich App at 80, citing MCR 3.977(K).

## B. ANALYSIS

The trial court may terminate parental rights on a showing of at least one statutory ground by clear and convincing evidence. MCL 712A.19b(3). In this case, the court terminated respondent's parental rights under MCL 712A.19b(3)(g) and (j), which, at the time of the termination proceedings, authorized termination under the following circumstances:

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.[4]

Both LL and RL disclosed during forensic interviews that they informed respondent of the abuse while still residing in Larkins's home. RL said that on the day it occurred, LL was on the phone with respondent and that he spoke to respondent and told her what happened. LL testified on three separate occasions in connection with the termination proceedings. At the first trial in January 2017, LL testified that she did not tell respondent about the sexual abuse until after her godmother removed her from Larkins's home and after CPS became involved. LL said that when she told her, respondent replied that LL and her godmother needed to call the police and that she was going to call the police. LL testified again in May 2017. She said that after the first incident, she told respondent about it a couple of days later on the phone. According to LL, respondent advised her to call the police and said that she would send over LL's adult brother, but she never did. She testified that she told respondent about the second sexual abuse incident the morning after it occurred. LL said that after the third incident of sexual abuse, she spoke to respondent on the phone two nights later; LL further stated that respondent advised her "to tell somebody" and advised the children to all sleep in the same room and place something near the door to awaken them if Larkins entered. But at the termination trial October 2017, LL testified that she could not remember if she told respondent about the first incident of sexual abuse, although she thought she might have told her about the second incident, and that after the third incident of sexual abuse, she "sneaked on the phone" and called respondent that same night. According to LL, respondent told the children to call the police and sleep in the same room together, and that she would send someone over to talk to Larkins. LL stated again that she told respondent about the sexual abuse while still living in Larkins's home. LL said that even after her godmother removed her from Larkins's home, she told respondent about the abuse, and respondent advised LL and her godmother that *they* should call the police. The record does not indicate that respondent called CPS or the police or intervened in any way.

The trial court found that despite LL's inconsistent testimony, she did communicate to respondent at some point while still residing with Larkins that the abuse was taking place and that RL also communicated to respondent that abuse was taking place. In its written order, the trial court acknowledged that it could "not say with certainty the timeframe" that respondent became aware of the abuse, but that at some point before the children were out of Larkins's home, respondent knew and failed to remove the children from the home. Based on these findings, it terminated respondent's parental rights pursuant to MCL 712A.19b(3)(g) and (j).

---

[4] MCL 712A.19b(3)(g) was amended, effective June 12, 2018. See 2018 PA 58. It now reads:

The parent, *although, in the court's discretion, financially able to do so,* fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age. (Emphasis added.)

The trial court did not clearly err by finding that termination was appropriate under MCL 712A.19b(3)(j). A trial court may rely on a parent's problematic history in determining that there is a reasonable likelihood that a child will harmed if placed in the parent's home. *In re Archer*, 277 Mich App 71, 75-76; 744 NW2d 1 (2007). Respondent's children were removed from her care in 2015 because her live-in partner was alleged to have abused her older children physically and emotionally, and respondent eventually admitted to a CPS worker that she knew of the abuse. Further, even after the parental rights of her younger children's father had been terminated, there was testimony that respondent continued to allow him to have contact with them. We find it is clear from the record that the trial court relied on respondent's failure to report or intervene to protect LL and LR from sexual abuse in terminating her parental rights. The fact that respondent did nothing to intervene or protect the children from sexual abuse supports the trial court's finding that it is reasonably likely that the children would be harmed if returned to her home. *Id*. Because respondent was unable to take the necessary steps to protect her children, it was clear that she could not provide proper care and custody for them. MCL 712A.19b(3)(g). As the trial court recognized, respondent played absolutely no part in rescuing the children from future harm. The trial court did not clearly err by finding clear and convincing evidence supported grounds for termination under MCL 712A.19b(3)(g) and (j).

Respondent's only argument is that because LL's testimony changed over time and because the trial court could not calculate an exact timeline of when respondent was informed of the abuse, there was insufficient evidence to find that the statutory grounds had been established. We, however, defer to the trial court's special ability to judge the credibility of a witness. *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

## IV. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondent also argues that the court erred by finding that it was in the children's best interests to terminate her parental rights. We review a trial court's decision regarding a child's best interests for clear error. *In re Laster*, 303 Mich App 485, 496; 845 NW2d 540 (2013).

### B. ANALYSIS

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. In determining a child's best interests, the court must consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App at 713 (quotation marks and citation omitted). Other factors a court may consider are "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the

parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714. A child's placement with a relative weighs against termination. *In re Olive/Metts*, 297 Mich App at 43; MCL 712A.19a(8)(a).[5]

Although LL expressed a desire to live with respondent and said that she believed respondent could keep her safe, a child's "interest in maintaining a relationship with [his or her parent] exists only to the extent that it would not be harmful to [the child]." *In re MU*, 264 Mich App 270, 282; 690 NW2d 495 (2004). Despite LL's feelings, respondent's poor history of protecting her children against physical and sexual abuse supported the trial court's finding that termination of her parental rights was in LL's best interests. Although it may be true that LL is unlikely to be adopted because of her age, given respondent's inability to recognize her children's need for safety and protection, the trial court did not clearly err by finding that her best interests would be served by termination of respondent's parental rights.

As for JP, the foster care specialist testified that respondent had not kept in contact with him while he was in a legal guardianship and that the two were only "working on" creating a bond. Further, her failure to take any steps to contact the authorities or remove LL or RL, JP's siblings, with whom he was residing, from an environment where sexual abuse was taking place supported the trial court's finding that termination was in his best interests. "How a parent treats one child is certainly probative of how that parent may treat other children." *In re LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973). Respondent's argument that JP was unlikely to be adopted is simply not persuasive in light of her failure to protect his siblings and the lack of relationship between the two.

Finally, the trial court did not clearly err by finding that it was in AL's, BL's, and JL's, best interests to terminate respondent's parental rights. In making that determination, the trial court considered the three as a group, which is appropriate when the children's individual interests are not significantly different. *In re White*, 303 Mich App at 715. The trial court heard testimony that respondent allowed them to have contact with their father after his parental rights were terminated and that respondent was attending only one or two visits a month, despite being offered four. The trial court also explicitly considered that the children were in a relative placement with their paternal aunt, who was willing to provide long-term care, but found that that placement did not outweigh the benefit of terminating respondent's parental rights. Respondent's failure to intervene in any way to protect her older children, her long history with CPS and the fact that she did not consistently visit the children, supported the trial court's conclusion that termination was in the children's best interests.

We affirm.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Karen M. Fort Hood

---

[5] At the time the termination took place, this provision was found in MCL 712A.19a(6)(a).